**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 25-1004**

---

LATASHA ROUSE; EXABIA ROUSE; DANIEL RILEY; JESSICA RILEY; OSCAR DAVINES; SHERRYL DAVINES,

        Plaintiffs - Appellants,

v.

MATTHEW FADER; STEVEN GOULD; BRYNJA BOOTH; SHIRLEY WATTS; PETER K. KILLOUGH; JONATHAN BIRAN; ANGELA M. EAVES; WES MOORE, in his official capacity as Governor of the State of Maryland,

        Defendants - Appellees.

---

Appeal from the United States District Court for the District of Maryland, at Baltimore. James K. Bredar, Senior District Judge.  (1:22-cv-00129-JKB)

---

Argued:  October 23, 2025                      Decided:  March 24, 2026

---

Before GREGORY, HARRIS, and RICHARDSON, Circuit Judges

---

Vacated and remanded by published opinion.  Judge Richardson wrote the majority opinion, in which Judge Harris joined.  Judge Gregory wrote a dissenting opinion.

---

**ARGUED:**  Phillip R. Robinson, CONSUMER LAW CENTER LLC, Silver Spring, Maryland, for Appellants. Kevin Michael Cox, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees.  **ON BRIEF:** Anthony G. Brown, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees.

RICHARDSON, Circuit Judge:

Members of our military on active duty receive procedural protections in civil suits. These protections ensure that those actively defending our nation get a fair shake in civil courts, safeguarding their civil rights and pausing legal burdens so they can concentrate on their military responsibilities. 50 U.S.C. § 3902. Plaintiffs—several servicemembers and their spouses—allege that Maryland failed to comply with these protections. So they sued the Governor of Maryland and the Justices of the Supreme Court of Maryland, claiming they should have taken steps available to them in their respective positions to require compliance with the federal statute. But these are not proper defendants because Plaintiffs' injuries are not traceable to their acts or omissions. Plaintiffs' injuries arose from violations of the Servicemembers Civil Relief Act, but Defendants did not cause those violations. Plaintiffs thus lack standing to bring this suit, and it must be dismissed. *See* William Baude & Samuel L. Bray, *Proper Parties, Proper Relief*, 137 Harv. L. Rev. 153, 155 (2023) ("Article III requires the proper parties, seeking proper relief.").

## I.    BACKGROUND

The Servicemembers Civil Relief Act seeks both to enable servicemembers "to devote their entire energy to the defense needs of the Nation," and "to provide for the temporary suspension of judicial and administrative proceedings and transactions that may adversely affect the civil rights of servicemembers during their military service." 50 U.S.C. § 3902(1)–(2). To these ends, the Relief Act guarantees certain procedural protections to ensure that servicemembers are not unduly surprised during their deployment by adverse legal or financial consequences at home. It applies "to any judicial or administrative

2

proceeding commenced in any court or agency in any jurisdiction subject to this chapter," other than "criminal proceedings." 50 U.S.C. § 3912(b). And it specifically applies to "any civil action or proceeding . . . in which the defendant does not make an appearance." 50 U.S.C. § 3931(a). The Act provides that "before entering judgment for the plaintiff," the court "shall require the plaintiff to file . . . an affidavit" stating "whether or not the defendant is in military service." § 3931(b)(1). If the defendant is in active military service, then "the court may not enter a judgment until after the court appoints an attorney to represent the defendant." § 3931(b)(2).

Plaintiffs are three married couples, each with one spouse who was an active-duty servicemember during the relevant times. This case originates from their dealings with George LeMay. LeMay, acting through his business Western Education Corp., used door-to-door salesmen on military bases to sell educational materials to servicemembers and their families. LeMay's scheme allegedly targeted vulnerable servicemembers with overpriced or worthless materials. Each Plaintiff entered purported contracts for consumer goods with LeMay to buy educational materials. After Plaintiffs refused to pay for the materials, LeMay sued them. LeMay eventually obtained state-court judgments worth thousands of dollars against each couple. But each judgment was allegedly defective— and some were later overturned on appeal.

Undeterred, LeMay went to Maryland and invoked its Uniform Enforcement of Foreign Judgments Act.[1] In doing so, he managed to have all three dubious out-of-state

---

[1] Md. Code Ann., Cts. & Jud. Procs. § 11-801 *et seq.* Maryland is one of forty-eight states that have adopted the Uniform Enforcement of Foreign Judgments Act, which

judgments domesticated—that is, recognized and rendered enforceable—by state-court clerks in Maryland. *See* Md. Code Ann., Cts. & Jud. Procs. § 11-802. No Plaintiff made an appearance in the Maryland state courts before the clerks domesticated these judgments. Nor did LeMay file an affidavit stating whether Plaintiffs were servicemembers. Nor did the court appoint counsel for Plaintiffs.

With these domesticated judgments, LeMay then filed petitions for writs of garnishment against each couple. Yet again, Plaintiffs were not appointed counsel and did not appear before the issuance of these writs. At no point did the court require LeMay to file any affidavit stating whether any Plaintiff was a servicemember. Even so, the writs were granted by clerks of the Maryland state district courts presiding over the *ex parte* collection proceedings. As a result, Plaintiffs' bank accounts were frozen. After realizing what happened, Plaintiffs filed motions to vacate the foreign judgments. The Maryland courts eventually granted these motions, but in the meantime, Plaintiffs suffered from the loss of access to, and interest on, their assets.

---

provides procedures for registering and enforcing sister-state (foreign) judgments. To register a foreign judgment under Maryland's Act, a judgment creditor must file an authenticated copy of the judgment with the clerk of a Maryland district or circuit court. § 11-802(a)(2). Consistent with the Full Faith and Credit Clause of the United States Constitution, the Act provides that, once filed, "[t]he clerk shall treat the foreign judgment in the same manner as a judgment of the court in which the foreign judgment is filed," and the "foreign judgment has the same effect and is subject to the same procedures, defenses, and proceedings . . . as a judgment of the court in which it is filed." § 11-802(a)(3), (b); *see* U.S. Const. art. IV, § 1.

4

Plaintiffs brought this action in federal court in January 2022. They named LeMay as a Defendant, arguing that his actions violated the Relief Act.[2] Plaintiffs also named then-Governor of Maryland Lawrence Hogan as a Defendant in his official capacity. Plaintiffs reached a settlement with LeMay, and the court subsequently dismissed him from this action. With LeMay out, Plaintiffs filed an amended complaint reasserting their claims against now-Governor Moore, again in his official capacity, and adding the Justices of the Supreme Court of Maryland as Defendants, also in their official capacities.

In their amended complaint, Plaintiffs argued that absent Defendants' "failure to ensure its law and rules of procedure . . . [were] in compliance with basic Due Process and the [Relief Act,] . . . Plaintiffs would not have sustained any damages."[3] J.A. 24. They thus sought (1) damages; (2) an injunction preventing Defendants from "issu[ing] or enforc[ing] any purported judgments . . . that do not comply with the basic requirements of the" Relief Act; (3) an injunction directing Defendants to expunge all records of the collection proceedings involving LeMay and Plaintiffs; and (4) a declaratory judgment stating that the Relief Act "preempts Maryland law including the Uniform Enforcement of Foreign Judgments Act" and that "any judgments obtained in violation of the [Relief Act] in the State of Maryland . . . are unenforceable." J.A. 73–74.

---

[2] The Relief Act creates a private right of action: "Any person aggrieved by a violation of this chapter may in a civil action—(1) obtain any appropriate equitable or declaratory relief with respect to the violation; and (2) recover all other appropriate relief, including money damages." 50 U.S.C. § 4042(a).

[3] Plaintiffs claim as damages the temporary loss of account access and lost interest.

5

Plaintiffs claim that Governor Moore is a proper party because he is "'vested' with the 'executive power' of the State of Maryland." J.A. 29 (quoting Md. Const. art. II, § 1). He is thus charged with the faithful execution and enforcement of Maryland's laws, "including Maryland's Uniform Enforcement of Foreign Judgments Act." J.A. 29 (citing Md. Const. art. II, § 9). Plaintiffs also note the Governor's duty to "inform the Legislature of the condition of the State and recommend to their consideration such measures as he may judge necessary and expedient." *Id.* (quoting Md. Const. art. II, § 19).

Plaintiffs argue that the Justices of the Supreme Court of Maryland—again, sued in their official capacities—are also proper parties because of their authority "to appoint members of the Rules Committee," "to make recommendations to the Rules Committee for changes to the Maryland Rules," and to "adopt amendments . . . and new rules of civil procedure that apply to every state court within Maryland." J.A. 30 (citing Md. Const. art. IV, § 18; Md. Code Ann., Cts. & Jud. Procs. § 13-301; Md. Rule 16-701). Plaintiffs further allege that the Justices are collectively responsible for the "enforcement and application of the statutes and Maryland Rules at issue in this matter," J.A. 69, and that the Chief Justice in particular has "overall responsibility for the administration of the courts of the State." J.A. 30 (quoting Md. Rule 16-102(a)).

In a series of rulings on Defendants' motions to dismiss and for summary judgment, the district court ultimately rejected Plaintiffs' claims. First, the district court found that domesticating a foreign judgment in Maryland failed to even implicate the Relief Act. *Rouse v. Moore*, 724 F. Supp. 3d 410, 422 (D. Md. 2024). Such a domestication, it reasoned, is not a "judgment for the plaintiff," which triggers the Relief Act's protections.

6

*Id.*; *see* 50 U.S.C. § 3931(b)(1) (requiring "the court" to take certain steps "before entering judgment for the plaintiff"). Rather, the court reasoned, domestication "merely accepts a facially valid and authenticated judgment from a sister state," without conferring any "meaningful new or additional benefit." *Rouse*, 724 F. Supp. 3d at 422; *but see* 50 U.S.C. § 3911(9) (broadly defining judgment as "any judgment, decree, order, or ruling, final or temporary"). The district court thus dismissed the claims against the Governor on the ground that domestication provided the only possible basis on which to hold him liable. *Rouse*, 724 F. Supp. 3d at 423.

Second, the district court found that, unlike domestication, issuing a writ of garnishment implicates the Relief Act's procedural protections. The Maryland Rules provide means of enforcing a judgment, including via garnishment of a judgment debtor's assets. *See* Md. Rules 3-645, 3-645.1, 3-646. Rule 3-645 states that "the clerk *shall issue* a writ of garnishment directed to the garnishee" once the judgment creditor files a request for garnishment "in the same action in which the judgment was entered." Rule 3-645(b) (emphasis added). The writ, in turn, orders "the garnishee to hold . . . the property of each judgment debtor . . . and all property of each debtor that may come into the garnishee's possession after service of the writ." Rule 3-645(c)(2). The writ issues whether or not the judgment debtor appears in the enforcement action. *See Rouse*, 724 F. Supp. 3d at 423–24. Because the Maryland courts that issued the writs in this case did not require LeMay to submit an affidavit stating whether Plaintiffs were servicemembers, the district court concluded that the writs of garnishment violated the Relief Act's requirements. *Id.* at 427.

7

Third, based on this understanding of the Relief Act violations, the district court addressed Plaintiffs' requested relief. *Id.* at 427–30. It first noted that Plaintiffs lacked Article III standing to sue the Justices for injunctive relief because they do not face any ongoing or imminent threat of having their rights under the Relief Act violated in the future. *Id.* at 428. But the district court then held that Plaintiffs did have standing to seek damages from the Justices because the freezing of their accounts (which led to lost interest) was redressable and traceable to certain omissions of the Justices. *Id.* at 429–30. Regarding traceability, the court reasoned that even though LeMay initiated the garnishment proceedings, it was Maryland's courts that issued the writs. Because "[e]nforcement of a money judgment may only be had in accordance with the Maryland Rules and statutes," J.A. 94,[4] and because the Justices are "vested with the authority to supervise, manage, and control" Maryland's judiciary, J.A. 512, the court reasoned the Justices *could have* used that authority to require the clerks who issued the writs to comply with the Relief Act's protections. *Rouse*, 724 F. Supp. 3d at 429–30. And if the Justices had done this, the clerks would not have issued the writs, because compliance with the Relief Act's requirements would have given Plaintiffs a chance to defend against the dubious judgments. *Id.* Based on this chain of reasoning, the district court denied Defendants' motion to dismiss.

Having survived the motion to dismiss in part, Plaintiffs then sought leave to file a second amended complaint, and Defendants moved for summary judgment, addressing, among other issues, whether the Justices could be held liable for actions taken in their non-

---

[4] *See* Md. Rules 2-631, 3-631 (both stating that "[j]udgments may be enforced only as authorized by these rules or by statute").

8

legislative enforcement and administrative roles. After briefing, the district court denied Plaintiffs' motion for leave to file their proposed second amended complaint, finding that doing so would be futile. And the court granted Defendants' motion for summary judgment, on the theory that the Justices' individual-capacity legislative immunity inures to the benefit of the State in an official-capacity action.[5] *Rouse v. Fader*, 758 F. Supp. 3d 397, 400, 406–12 (D. Md. 2024).

## II.    DISCUSSION

### A.    Plaintiffs Lack Standing[6]

Though we agree with the conclusion that the suit must be dismissed, we take a different route than the district court. The district court should have dismissed Plaintiffs'

---

[5] Because, as we explain below, Plaintiffs lack standing to sue either the Justices or the Governor, we do not address the merits of Plaintiffs' claims. *See Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007). We do not consider the district court's holding that Maryland waived sovereign immunity under "the plan of the Convention." *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584–85 (1999); *cf. Torres v. Tex. Dep't of Pub. Safety*, 597 U.S. 580 (2022). Nor do we review the court's holding that Maryland benefits from the Justices' personal immunity. *See Ruhrgas*, 526 U.S. at 584–85; *cf. Kentucky v. Graham*, 473 U.S. 159, 167 (1985); *Hughes v. Blankenship*, 672 F.2d 403, 405–06 (4th Cir. 1982); *Cushing v. Packard*, 30 F.4th 27, 39–40, 40 n.13 (1st Cir. 2022).

[6] Although neither party raised the question of standing in their briefs, Article III justiciability issues "cannot be waived or forfeited." *Va. House of Delegates v. Bethune-Hill*, 587 U.S. 658, 662–63 (2019). Instead, we have an "independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006). "The threshold issue of standing is a legal question that we examine de novo." *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 553 (4th Cir. 2013). The plaintiff bears the burden of establishing standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). At summary judgment, a plaintiff may not rest on "mere allegations," but must "set forth . . . specific facts" supporting jurisdiction. *Id.* (quoting Fed. R. Civ. P. 56(e)).

claims for lack of subject matter jurisdiction because they lack Article III standing to sue either the Justices or the Governor.[7]

### 1.    Plaintiffs' injuries are not fairly traceable to the Justices' acts or omissions

Federal courts may resolve only "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. Among other things, this limitation on the power of federal courts requires a plaintiff to have "standing" to bring suit. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). To have standing, a plaintiff must show three things: "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Id.* (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

We accept Plaintiffs' allegation that the freezing of their accounts (and the resulting lost interest) constitutes a concrete, particular, and actual injury which would be redressed

---

[7] We agree with the district court that Plaintiffs lack standing to seek injunctive or declaratory relief. "[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). When seeking injunctive relief, a plaintiff must "show that he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct and the injury or threat of injury must be both real and immediate, not conjectural or hypothetical." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–02 (1983) (internal quotations omitted); *see also O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974). Here, Plaintiffs do not have standing to seek prospective injunctive relief. For Plaintiffs' rights under the Relief Act to be violated again, someone else would need to obtain a foreign judgment and then register and enforce it in Maryland, doing so in a manner that fails to comply with the Relief Act, all while Plaintiffs are still on active duty. *Rouse*, 724 F. Supp. 3d at 428–29. This attenuated chain cannot support standing. And, as the district court also explained, Plaintiffs lack standing to seek declaratory relief for the same reason. *Id.* at 429; *see Preiser v. Newkirk*, 422 U.S. 395, 402 (1975); *Wells v. Johnson*, 150 F.4th 289, 300–03 (4th Cir. 2025).

with compensatory damages. *See Collins v. Yellen*, 594 U.S. 220, 243 (2021). But even a redressable injury must be traceable to a defendant's act or omission. And Plaintiffs have failed to show this.

Standing's traceability prong demands that a plaintiff's alleged injury be "fairly . . . traceable to the challenged action of the defendant, and not . . . the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (internal brackets omitted) (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976)); *see also Murthy v. Missouri*, 603 U.S. 43, 57–58 (2024). Satisfying this traceability requirement is especially difficult when a plaintiff's injury results *most immediately* from the conduct of a third party not before the court. In such cases, the plaintiff must allege some causal connection between the defendant's actions and the third party's intervening conduct. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413 (2013) (rejecting "standing theories that require guesswork as to how independent decisionmakers will exercise their judgment"). Where injury "arises from the government's . . . lack of regulation . . . of *someone else*," traceability "ordinarily hinge[s] on the response of the regulated (or regulable) third party to the government . . . inaction," making standing "substantially more difficult" to establish. *Lujan*, 504 U.S. at 562 (emphasis in original); *see also FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 383 (2024); *Allen v. Wright*, 468 U.S. 737, 758 (1984).[8]

---

[8] That said, traceability does not require showing proximate causation, for "Article III 'requires no more than *de facto* causality.'" *Dep't of Commerce v. New York*, 588 U.S. 752, 768 (2019) (quoting *Block v. Meese*, 793 F.2d 1303, 1309 (D.C. Cir. 1986) (Scalia, J.)); *see also DiCocco v. Garland*, 52 F.4th 588, 592 (4th Cir. 2022).

One way a plaintiff can meet this burden is by showing that his injury was "produced by [the] determinative or coercive effect" of the defendant's action "upon the action of someone else." *Bennett v. Spear*, 520 U.S. 154, 169 (1997); *see also Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Lansdowne, LLC*, 713 F.3d 187, 197 (4th Cir. 2013).

Alternatively, a plaintiff can satisfy the traceability requirement by alleging that his injury was "the predictable effect of Government action on the decisions of third parties." *Dep't of Commerce v. New York*, 588 U.S. 752, 768 (2019); *see also Lowy v. Daniel Def., LLC*, 167 F.4th 175, 195–97 (4th Cir. 2025).[9]

So when a plaintiff's injury results from third-party conduct, the plaintiff can satisfy traceability through either of two showings:  (i) the defendant's action had a determinative or coercive effect on the third-party's conduct; or (ii) the third party's conduct was the predictable effect of the defendant's action.  A claimed failure to remind officials to follow federal law doesn't satisfy either one.

---

[9] It is not entirely clear whether *Dep't of Commerce*'s "predictable effect" test is wholly distinct from *Bennett*'s "determinative or coercive effect" test, or whether the former is a species or explanation of the latter. *Cf. All. for Hippocratic Med.*, 602 U.S. at 383.  Both tests are keyed to the same inquiry:  whether a plaintiff can show traceability despite the fact that his injury resulted from an intervening third party's actions.  Arguably, then, considering "predictable effects" does not lower the bar, but simply describes the same causal relationship using different terminology.  After all, effects that are sufficiently determinative or coercive are also, by their nature, predictable.  In any case, as we explain below, today's result is the same either way.

Here, the action Plaintiffs challenge is the Justices' failure to promulgate a rule or otherwise act to require compliance with the Relief Act's procedural protections.[10] The relevant third-party conduct is the state-court clerks' issuance of writs of garnishment, which Plaintiffs argue violated the Relief Act.[11] We take no issue with Plaintiffs' allegations that this third-party conduct may have directly caused Plaintiffs' injuries: Had the clerks complied with the Relief Act's procedures, the writs likely would not have issued, and thus, the accounts would not have been frozen. The fatal flaw with Plaintiffs' traceability argument, however, is the tenuous causal link between the Justices' actions and the clerks' conduct. Plaintiffs' theory is essentially that "but for the Defendants' failure to ensure [Maryland's] laws and rules of procedure relating to enrollment of purported foreign judgments [and] garnishments" complied with the Relief Act, "Plaintiffs would not have sustained any damages or losses." J.A. 24. But Plaintiffs have not shown that the Justices'

---

[10] We should note that Maryland state-court clerks can fully comply with both Maryland's Uniform Enforcement of Foreign Judgments Act and with the Relief Act. Recall that the Maryland Act provides that a domesticated judgment "is subject to the same procedures, defenses, and proceedings for reopening, vacating, staying, enforcing, or satisfying as a judgment of the court in which it is filed." Md. Code Ann., Cts. & Jud. Procs. § 11-802(b). Thus, the Maryland Act subjects foreign judgments to the same procedures as domestic judgments, which may include Relief Act compliance. So there's no scenario where Maryland's Act and the Relief Act would impose conflicting obligations on a state-court clerk.

[11] The district court held that the domestication of a foreign judgment is not a "judgment" triggering the Relief Act's protections. We express no position on that question. Nor do we decide whether the issuance of a writ of garnishment is a "judgment" under the Relief Act's broad definition—which includes "any judgment, decree, order, or ruling, final or temporary." 50 U.S.C. § 3911(9). Instead, we assume that both the domestication of the foreign judgments and issuance of the writs of garnishment violated the Relief Act.

13

inaction had a determinative or coercive effect on the clerks' conduct, or made the clerks' conduct predictable.

First, the Justices' inaction neither coerced nor determined the clerks' decisions to domesticate the judgments and issue the writs of garnishment. The Relief Act imposes obligations directly on Maryland courts. *See* 50 U.S.C. § 3911(5) (defining "court" to include state courts). So a clerk's duty to follow § 3931's procedures exists independent of anything that the Justices did or did not do. Indeed, the clerks did not need a Maryland rule of civil procedure to understand and comply with their federal obligations—they were already legally obligated to do so. They simply needed to read the Relief Act. Thus, a Maryland rule incorporating § 3931 would have been nothing more than a reminder to comply with pre-existing obligations. Nor would any other action by the Justices do anything beyond directing the clerks and courts to do what federal law already demands that they do. So one cannot say the *absence* of such a rule or action determined or coerced the clerks' noncompliance with their Relief Act obligations. Plaintiffs' theory essentially posits that the clerks would not have violated federal law if the Maryland Rules included the same procedural protections as the Relief Act (or required compliance with it). But Plaintiffs have presented no evidence that the clerks would have acted differently if a redundant state rule such as this existed. So their theory of causation is precisely the sort of speculative inquiry that cannot satisfy traceability. *See Clapper*, 568 U.S. at 412–14.

This case thus differs from those in which the government's action had a determinative or coercive effect on a third party's conduct, thereby satisfying the traceability requirement. In *Bennett*, for example, the Fish and Wildlife Service issued a

14

"Biological Opinion," concluding that a Bureau of Reclamation project jeopardized certain fish species, but that maintaining minimum water levels in certain reservoirs could mitigate the project's impact on the fish. 520 U.S. at 158–59. Plaintiffs sued, challenging the Opinion's water-level recommendation. *Id.* at 160. The Government argued that the plaintiffs' injury was not traceable to the Service's Opinion because the Bureau of Reclamation "retain[ed] ultimate responsibility for determining whether and how a proposed action will go forward." *Id.* at 168. But the Supreme Court rejected that argument, because "while the Service's Biological Opinion theoretically serves an 'advisory function,' . . . in reality it has a powerful *coercive effect* on the action agency," and "[t]he Service itself is . . . keenly aware of the *virtually determinative effect*" of its Opinions. *Id.* at 169–70 (emphases added). The Bureau's refusal to comply would be "at its own peril" because of the Service's power to punish those who take actions potentially harmful to endangered species. *Id.* at 170. In other words, the Service's Opinion controlled what the Bureau could do, thus determining the Bureau's (a third party's) actions.

Here, the opposite is true. The Relief Act already prohibited what the clerks did. And the Justices did not authorize the clerks to ignore federal law; they simply failed to redundantly command compliance with it. So the Justices' inaction neither authorized nor determined the clerks' domestication of the foreign judgments or their issuance of the writs.

Second, Plaintiffs have failed to show that the clerks' domestications and issuance of writs of garnishment were the predictable effect of the Justices' inaction. State officials are required, and should be expected, to *comply* with binding federal law, not ignore it. *See* Md. Const., Decl. of Rts. art. II (declaring federal law the supreme law of the State); *cf.*

15

*Cooper v. Aaron*, 358 U.S. 1, 18 (1958) ("Every . . . judicial officer is solemnly committed by oath taken pursuant to Art. VI, cl. 3, 'to support this Constitution.'"); *Harlow v. Fitzgerald*, 457 U.S. 800, 818–19 (1982) (explaining that officials are presumed to know of their duty to respect people's constitutional rights). And Plaintiffs have presented no evidence that Maryland courts and clerks ignore binding federal laws unless incorporated or flagged by state-court rules or procedures.

This case thus differs from *Department of Commerce*, where the plaintiffs introduced evidence, based on documented patterns of behavior, that the government's addition of a citizenship question to the census would predictably deter some households from responding. 588 U.S. at 768. There, the plaintiffs proved—with evidence—that the government's action created a disincentive that predictably altered third-party conduct. *Cf. Bennett*, 520 U.S. at 169–71. Because Plaintiffs have not made a similar showing here—*i.e.*, that the Justices' failure to promulgate a redundant Maryland rule incentivized noncompliance with the Relief Act's obligations—they lack standing to pursue their claims against Maryland's Supreme Court Justices. *Cf. Allen*, 468 U.S. at 757–59.

### 2. Plaintiffs' injuries are not fairly traceable to the Governor's acts or omissions

Plaintiffs lack standing to sue the Governor for the same reasons. Plaintiffs allege that the Governor "is charged with enforcement" of Maryland's Uniform Enforcement of Foreign Judgments Act. But this merely recognizes the Governor's general executive authority. Plaintiffs have not explained—and cannot explain—how anything the Governor did or did not do relates to the clerks' allegedly unlawful conduct. Indeed, Plaintiffs

16

haven't suggested anything that the Governor could have done differently to prevent a violation of the Relief Act. Domesticating judgments and issuing writs of garnishment are judicial processes; the Governor neither initiates nor supervises those actions. Without any evidence connecting the Governor to Plaintiffs' injury (much less suggesting he caused the injury), Plaintiffs lack standing to sue the Governor.

**B.    Plaintiffs' Motion To Amend Their Complaint Was Futile**

Lastly, we consider the district court's denial of Plaintiffs' motion to amend their complaint for a second time. Because the district court denied the motion on futility grounds, our review is *de novo*. *See United States ex rel. Ahumada v. Nat'l Indus. for the Severely Handicapped*, 756 F.3d 268, 274 (4th Cir. 2014). While district courts should freely grant leave to amend, Fed. R. Civ. P. 15(a)(2), they should deny leave if amendment would be futile. *In re Triangle Cap. Corp. Sec. Litig.*, 988 F.3d 743, 750 (4th Cir. 2021). One way amendment is futile is if the proposed amended complaint fails to allege facts sufficient to support subject matter jurisdiction. *Ahumada*, 756 F.3d at 274, 279; *see Warth v. Seldin*, 422 U.S. 490, 518 (1975) ("It is the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers."). Because Plaintiffs would lack standing under their proposed amended complaint, the amendment would be futile.

In their proposed second amended complaint, Plaintiffs sought to expand the list of Defendants to include the State of Maryland, as well as the administrative judges and

17

administrative clerks[12] of the District Courts of Maryland for Anne Arundel and Garrett Counties, all in their official capacity.

These changes failed to cure Plaintiffs' lack of standing because they still do not allege facts showing how their injury is traceable to acts taken by the named administrative judges and administrative clerks.

As an initial matter, Plaintiffs do not allege that the administrative judges or administrative clerks issued the domestication orders and writs of garnishment at issue here.[13] At most, Plaintiffs allege that the administrative judges and administrative clerks

---

[12] Each Maryland district court has an administrative judge and administrative clerk. Md. Code Ann., Cts. & Jud. Procs. §§ 1-607, 2-602(b). They serve a special role and have duties that other judges and clerks do not. "The administrative judge is responsible for the administration, operation, and maintenance of the District Court in that district and for the conduct of the District Court's business." § 1-607; Md. Rule 16-107. The role is managerial, with duties like directing service of process, Md. Code Ann., Cts. & Jud. Procs. § 2-605, and recommending the appointment of constables, commissioners, and the chief administrative clerk to the Chief Judge of the district court. Md. Const. art. VI, §§ 41F, 41G; Md. Code Ann., Cts. & Jud. Procs. §§ 2-605, 2-607.

The administrative clerk also serves in a managerial role, "overseeing the operations of all District Court facilities in an assigned district" and having "full responsibility for the day-to-day functioning of all assigned courts including personnel, facilities, and case processing management." *Administrative Clerk: Maryland Judiciary Job Description*, Maryland Judiciary Human Resources (Jan. 2022).

In the proposed amended complaint, Plaintiffs named Erich Bean, the administrative judge, and Amy Bosley, the administrative clerk, for the District Court of Maryland for Garrett County, along with Shaem Spencer, the administrative judge, and Kathryn Glenn, the administrative clerk, for the District Court of Maryland for Anne Arundel County.

[13] This statement comes with two caveats. First, Plaintiffs do allege that *someone* issued the writs and judgments. But this does not matter, because they fail to specifically identify that someone. In the complaint, they state that the "District Court . . . by its authorized administrative officials, recorded and enrolled" foreign judgments against Plaintiffs "without any consideration of their rights" under the Relief Act. J.A. 656; *see also* J.A. 660, 666. They also claim that the "State of Maryland" and Maryland District Courts "did not require LeMay to include the required affidavit" and "issued garnishments"

18

have general supervisory responsibility over the courts that *did* issue these orders. In the "Parties" section of the proposed amended complaint Plaintiffs briefly mention administrative judges and describe their role, stating that they are "responsible for the administration and operation" of their respective courts. J.A. 648–49. The administrative clerks get even less attention. Plaintiffs identify them as administrative clerks, then say nothing else about them. It remains unclear what Plaintiffs suggest that the administrative judges and administrative clerks did or failed to do that led to Plaintiffs' injury.[14]

Nor do Plaintiffs provide any reason to think that the administrative judges' and administrative clerks' acts or omissions had a determinative, coercive, or predictable effect on the issuance of the judgments and writs. True, Plaintiffs broadly assert that their "claims asserted herein arise from the State of Maryland's conduct and practices in violation of the [Relief Act] within the practices, operations, and customs of the District Court[s]."

---

against Plaintiffs "in violation of" the Relief Act. J.A. 656–57. These statements do not tell us who actually took action. And Plaintiffs cannot ask this Court to guess by painting with such a broad brush. *See Langford v. Joyner*, 62 F.4th 122, 124–26 (4th Cir. 2023) (rejecting merely "collective allegations against all 'Defendants,'" that failed to identify "how each individual . . . was responsible"); *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015) (noting that a plaintiff "cannot assemble some collection of defendants and then make vague, non-specific allegations against all of them as a group").

Second, as it turns out, the two administrative clerks did some of the relevant documentation. But this does not matter because as noted above, Plaintiffs do not mention this anywhere in the complaint. We do not address the existence of standing based on allegations that Plaintiffs never made. *Cf. Whole Woman's Health v. Jackson*, 595 U.S. 30, 39–42 (2021).

[14] The proposed amended complaint still focuses on the Justices' duties and the State of Maryland's failure to require its officials to comply with federal law through a redundant Maryland Rule. It only names the administrative judges and clerks as defendants "in the alternative," added to the action in the event "it is determined" that the Justices "and the State itself are not the proper parties." J.A. 642, 649.

Charitably construed, this language might suggest that the administrative judges and administrative clerks allowed the courts to operate without ensuring compliance with the Relief Act. But just as with the Justices and the Governor, Plaintiffs fail to show how any failure by these defendants to do more to ensure compliance with the Relief Act had any effect on the issuance of the writs and judgments.

So, as pled, Plaintiffs' injuries are not fairly traceable to acts or omissions on the part of the administrative judges or administrative clerks. Plaintiffs thus lack standing to sue these proposed Defendants, their proposed amendment is futile, and the district court properly rejected their motion to file their proposed amended complaint.[15]

*          *          *

Plaintiffs' rights under the Relief Act may have been violated. But even a statutory violation does not permit them to conjure the power of the federal courts to sue whomever they please. Because their injuries are not fairly traceable to any act or omission by these Defendants, Plaintiffs have failed to sue proper parties. The district court's judgment is vacated and the case is remanded with instructions to dismiss without prejudice for lack of subject matter jurisdiction.[16]

---

[15] The same goes for the addition of the State of Maryland as a named defendant. Even in adding the State, Plaintiffs continue to rely on the acts or omissions by the Justices, the Governor, the administrative judges, or the administrative clerks. For the reasons we have explained, Plaintiffs fail to show those acts or omissions caused their injuries.

[16] "[B]ecause a court that lacks jurisdiction has no 'authority' to issue a ruling 'on the merits,' . . . we vacate and remand with instructions to state that the dismissal of the plaintiffs' claims . . . is based on lack of jurisdiction and is without prejudice." *Frazier v. Prince George's Cnty.*, 140 F.4th 556, 561–62 (4th Cir. 2025) (quoting *Ruhrgas*, 526 U.S. at 577).

20

*VACATED AND REMANDED*

GREGORY, Circuit Judge, dissenting:

Our Framers, in their wisdom, established three co-equal branches of government. Subject only to our Constitution, the judiciary's power is to effectuate Congress's intent. And we have a particular duty to effectuate Congress's intent when it enacts legislation under its "broad and sweeping power to raise and support armies" under the Constitution. *Torres v. Texas Dep't of Pub. Safety*, 597 U.S. 580, 585 (2022) (internal citations omitted). Such power is so prodigious that the States agreed at the founding that their sovereign immunity would "yield" to suits for damages authorized by Congress under Article I § 8. *Id.* at 584.

Congress enacted the Servicemembers Civil Relief Act ("Relief Act") to provide expansive protections to active-duty members of our military. Plaintiffs attempted to hold responsible the Justices of the Maryland Supreme Court who violated their rights under the Relief Act, as Congress expressly intended. Yet our courts have rendered their attempts fruitless.

Today's result strips Congress's statutory framework of influence and, as a result, deprives servicemembers of the opportunity to obtain a statutorily authorized remedy. I respectfully dissent.

## I.

Congress enacted the Relief Act to ensure servicemembers could "devote their entire energy to the defense needs of the Nation," and "to provide for the temporary suspension of judicial and administrative proceedings and transactions that may adversely

affect the civil rights of servicemembers during their military service." 50 U.S.C. § 3902(1)–(2). Soon after its initial enactment as the Soldiers' and Sailors' Civil Relief Act of 1940 ("SSCRA"), the Supreme Court noted that "the Act must be read with an eye friendly to those who dropped their affairs to answer their country's call." *Le Maistre v. Leffers*, 333 U.S. 1, 6 (1948).

The Relief Act was introduced in its current form in 2003 to enhance the existing protections outlined in the SSCRA. Representative Christopher Smith of New Jersey, who introduced the bill to amend the SSCRA, emphasized that one of the new Act's key improvements was to "[e]xpand the SSCRA provision temporarily suspending legal proceedings that may prejudice the civil legal rights of military personnel to include administrative as well as judicial proceedings." 149 Cong. Rec. E14-02 (daily ed. Jan. 8, 2003) (remarks of Rep. Smith).

Among these protections, the Relief Act mandates that a court "shall require" the plaintiff to file an affidavit addressing whether any defendant is an active-duty servicemember before a court's entry of judgment for the plaintiff, and (2) the court "may not enter judgment" before counsel is appointed for the servicemember. 50 U.S.C.A. § 3931(a)–(b). To ensure redress, the Relief Act's broad cause of action allows "[a]ny person aggrieved by a violation of this chapter" to commence a civil action for monetary damages. 50 U.S.C.A. § 4042.

However, though Congress specified that servicemembers should receive these procedural protections before judgment is entered against them, Plaintiffs suffered harm because various states did not comply with Congress's requirements. Maryland courts

23

gave legal effect to default judgments against Plaintiffs, relying on purportedly invalid out-of-state judgments. The Justices did not establish rules mandating compliance with the Relief Act, and Maryland's administrative judges and clerks seemingly did not implement or require the Relief Act's protections on three separate occasions.[1]

As a result, the active-duty servicemember Plaintiffs were forced to bear an impossible burden. Plaintiffs' bank accounts were frozen, and they were forced to hire counsel to vacate those judgments. Plaintiff Latasha Rouse, who was stationed in Hawaii at the time, stated that the ordeal "caused [her] and [her] family more hardship than [they] were already facing . . . by taking every penny [she] had in [her] bank account." J.A. 130.

## II.

The district court's opinion raises several issues worth our consideration. But I will focus today on the majority's driving concern: that Plaintiffs lack standing.[2] The Justices' rules have a predictable and determinative effect on the administrative judges' and clerks' actions, so I would hold that Plaintiffs maintain standing to proceed with their suit.

## A.

The Relief Act instructs courts to comply with certain procedural requirements. Congress's statute provided such a directive: "the court shall require" the plaintiff to file an affidavit addressing whether any defendant is an active-duty servicemember before a

---

[1] Like the majority, Maj. Op. 14, I assume for the purposes of this dissent that both the domestication of the foreign judgments and the issuance of the writs of garnishment violated the Relief Act.

[2] I agree that Plaintiffs lack standing to seek damages from the Governor.

24

court's entry of judgment for the plaintiff, and (2) the court "may not enter judgment" before counsel is appointed for the servicemember.  50 U.S.C.A. § 3931(a)–(b).  *See Maine Cmty. Health Options v. United States*, 590 U.S. 296, 311 (2020) (stating that when "Congress distinguishes between 'may' and 'shall,' it is generally clear that 'shall' imposes a mandatory duty") (internal citations omitted).  This responsibility extends to the *court* charged with entering judgment for a servicemember, not just the clerk who accepts the affidavit.

So, even though the Relief Act places general requirements on courts, the Justices are responsible for specifying *how* actors in Maryland's courts should comply.  The rules promulgated by Maryland's highest court "concern[] the practice and procedure in and the administration of the appellate courts and in the other courts of this State, which shall have the force of law until rescinded, changed or modified by the Court of Appeals or otherwise by law."  Md. Const. art IV § 18.  Thus, while administrative judges and clerks would ideally possess an understanding of all federal law applicable to their positions, the Supreme Court of Maryland is the party responsible for outlining those requirements.  Maryland's Rules are not merely advisory:  they define with specificity the legal obligations imposed on Maryland courts.  For that reason, the Relief Act's mere existence does not eliminate the connection between the rules promulgated by the Justices and the acts of Maryland's administrative judges and clerks.  It strengthens it.

Several states have heeded Congress's instruction and incorporated the Relief Act's protections into its rules or laws.  Some have enacted legislation tasking the state's highest courts with the responsibility of implementing the Relief Act's affidavit requirements.  *See*

25

Va. Code § 8.01-15.2. And even more provide guidance to litigants regarding the Relief Act's requirements on their websites.[3] The state officials charged with promulgating rules in these states no doubt recognized that, in practice, court administration runs on local rules. Court employees will look to those local rules for guidance.

Additionally, while sovereign immunity would ordinarily bar a suit like this—against state actors sued in their official capacities—the Supreme Court recognized that such a bar does not exist to suits brought against the state pursuant to legislation Congress has used its war powers to enact. *Torres*, 597 U.S. at 584. This, too, underscores the status we accord to members of our military, and the importance of permitting suits by servicemembers in federal courts. As is clear from this case, an entry of default judgment against an active-duty servicemember imposes a hefty burden Congress has already expressed is impermissible. We should read the Relief Act's protections as Congress intended: with an eye friendly to the servicemembers who are too busy defending the nation to be bogged down with frivolous suits.

With this backdrop, I move to standing.

## B.

Article III standing requires a Plaintiff show that "(1) they have suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant;

---

[3] Maryland has since included a guide to Relief Act compliance on the court's website. *See Plaintiff's Guide to SCRA Compliance*, Md. Cts., https://www.mdcourts.gov/district/selfhelp/scra; https://perma.cc/R2QD-ASGP (last visited, March 16, 2026).

and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Sierra Club v. United States Dep't of the Interior*, 899 F.3d 260, 283 (4th Cir. 2018) (internal citations omitted). The majority holds that Plaintiffs cannot establish the second prong: that the injury they experienced is "fairly traceable to the challenged action of the defendant." *Id.*

To establish traceability, Plaintiffs must show that the challenged action is "at least in part responsible for frustrating" their rights under the Relief Act. *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 316 (4th Cir. 2013). But that inquiry "does not require" the Justices' actions "be the sole or even immediate cause of the injury." *Sierra Club*, 899 F.3d at 284. Nor does it require any more than "de facto causality, a standard that is, of course, lower than for proximate causation." *Ateres Bais Yaakov Acad. of Rockland v. Town of Clarkstown*, 88 F.4th 344, 353 (2d Cir. 2023) (citing *Dep't of Commerce v. New York*, 588 U.S. 752, 768 (2019)). The Justices' actions need not even have been "'the very last step in the chain of causation.'" *Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand, LLC*, 713 F.3d 187, 197 (4th Cir. 2013) (citing *Bennett v. Spear*, 520 U.S. 154, 169 (1997)). Instead, Plaintiffs must show that the Justices' acts or omissions had either a "predictable" or "determinative or coercive" effect on the administrative judges' and clerks' actions. *Lowy v. Daniel Def., LLC*, 167 F.4th 175, 196 (4th Cir. 2026) (internal citations omitted). On either theory, I believe Plaintiffs have made the required showing.

A plaintiff meets their burden of establishing traceability when they show that third parties are "likely [to] react in predictable ways" to a defendant's actions. *Dep't of Commerce*, 588 U.S. at 768. The Supreme Court recently emphasized that "[c]ourts must

27

distinguish the 'predictable' from the 'speculative' effects of government action or judicial relief on third parties" and "conclude that 'third parties will likely react' to the government regulation (or judicial relief) 'in predictable ways' that will likely cause (or redress) the plaintiff's injury." *Diamond Alternative Energy, LLC v. U.S. Environmental Protection Agency*, 606 U.S. 100, 105–07 (2025) (citing *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024)). So Plaintiffs need not show that the Justices' rules will absolutely change the administrative judges' and clerks' behavior. Such a change must simply be "likely." *Dep't of Commerce*, 588 U.S. at 768.

In *Lowy*, we held that plaintiffs sufficiently pleaded that defendants' conduct had a "predictable effect" on a third party's actions. 164 F.4th at 196 (internal citations omitted). The plaintiffs in *Lowy* were two individuals who were "brutally maimed and injured" in a 2022 school shooting. *Id.* at 181. The defendants were manufacturers of assault rifles, assault rifle accessories, and ammunition that plaintiffs sought to hold accountable for their injuries under Virginia's consumer protection statute. *Id.* at 184. At the motion to dismiss stage, the district court dismissed plaintiffs' claims on standing grounds, ruling that plaintiffs could not establish that their alleged injuries were traceable to defendants' alleged misconduct. *Id.* at 181.

We reversed, holding that, even though the third party responsible for plaintiffs' injuries was not before the court, the allegations that the gun manufacturers knew or should have known their method of marketing firearms would impact whether third parties like the shooter would use such weapons to injure the plaintiffs sufficed to establish traceability. *Id.* at 197. As *Lowy* makes clear, a straight line is not required—instead, the plaintiff must

28

simply establish that plaintiffs rely on more than "mere speculation about the decisions of third parties." *Dep't of Commerce*, 588 U.S. at 768. The record here satisfies the required showing.

Maryland's judges and clerks know they are bound by Maryland's rules, and they (presumably) endeavor to comply with those rules. If the Justices clarified the responsibilities imposed on them, it is fair to assume the judges and clerks would comply, exempting the occasional rogue actor. After all, that is the Justices' responsibility: they dictate how Maryland's courts operate, rendering any systemic failure traceable to them. And from what we know, this was a systemic failure—at least three separate Maryland court employees harmed Plaintiffs in an identical way, contrary to the Relief Act's protections. It is hard to imagine what actions could have a "predictable effect" on the administrative clerks' actions if the Justices' rules do not. *Id*. This is not a case where traceability is lacking because the injury depends on the "unfettered choices" of independent actors "whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict." *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989). We can fairly predict here that the judiciary's employees will respond to the rules that govern them.

Because judiciary employees live in the world of judicial rules, I would likewise hold that the Justices' actions had a "determinative or coercive effect" on the actions of the administrative judges and clerks. *Bennett*, 520 U.S. at 169. A defendant's actions have such an effect on third parties, when, though they do not create a "legally binding prohibition," they have a "virtually determinative effect" on the third party's actions. *Dow*

29

*AgroSciences LLC v. Nat'l Marine Fisheries Serv.*, 637 F.3d 259, 266 (4th Cir. 2011) (citing *Bennett*, 520 U.S. at 170). In *Bennett*, the Supreme Court recognized that the Fish and Wildlife Service's Biological Opinion had a "determinative or coercive effect" on the Bureau of Reclamation because the Bureau almost never acted contrary to the Service's Opinion. *Bennett*, 520 U.S. at 169–70. The Supreme Court held that this causal relationship accordingly established traceability.

Here, Plaintiffs' argument for traceability is even stronger than that in *Bennett*. Maryland's Constitution explicitly states that the Justices are responsible for governing the judiciary, and the rules they promulgate have the "force of law" and define how judicial employees must act. Md. Const. art. IV, § 18. This *is* a "legally binding prohibition" on the third party's actions. *Dow AgroSciences LLC*, 637 F.3d 259 at 266. When the Justices promulgate updated rules, it "alters the legal regime to which the [administrative judges and clerks are] subject." *Bennett*, 520 U.S. at 169. It changes the rules governing their actions, subjecting them to a new set of obligations. Such a change would necessarily influence their conduct, whether or not those obligations had been previously prescribed by federal law.

The majority faults Plaintiffs for failing to provide evidence of how, and to what extent, the administrative judges and clerks would act differently if Maryland's Rules included the Relief Act's protections. Maj. Op. 15. But they ask the wrong question. The cases they cite are distinct *because* the tenuous connection between the defendant and the third-party required ample justification. In *Bennett*, for example, the Fish and Wildlife Service's Biological Opinion lacked the force of law, so plaintiffs needed to demonstrate that

30

the Opinion influenced the Bureau of Reclamation's behavior. 520 U.S. at 169. The governing regulations specified that "[f]ollowing the issuance of a biological opinion, the Federal agency shall determine whether and in what manner to proceed with the action in light of its section 7 obligations and the Service's biological opinion." *Id.* at 168 (quoting 50 CFR § 402.15(a) (1995)). Because, in practice, the Service's Opinion had a "virtually determinative effect" on the Bureau's actions, the Supreme Court recognized that the Opinion had a "determinative" or "coercive effect" on the Bureau's behavior. *Id.* at 169–70.

However, if the regulation in *Bennett* stated something different—that "following the issuance of a biological opinion, the Federal agency *shall* comply with the Service's biological opinion"—whether the Bureau's actions were traceable to the Service's Opinion would be assumed.

The majority also relies on *Dep't of Commerce*, 588 U.S. at 768, to emphasize Plaintiffs' failure to put forth evidence establishing traceability. Maj. Op. 17. In *Dep't of Commerce*, the Supreme Court held that plaintiffs had standing because they had established, through evidence presented at a bench trial, the likely effects of the defendant's actions on a third party's behavior. 588 U.S. at 768. The district court credited the Census Bureau's theory at trial: that third parties would "likely react in predictable ways" to a citizenship question. *Id.* On appeal, the Supreme Court determined the lower court's factual finding was not clearly erroneous. *Id.* But, unlike the case before us, the Census Bureau's theory required a robust factual record; without it, the case—based on the hypothetical feelings of third parties—would rely on pure conjecture. *See also Lansdowne*, 713 F.3d at 197 (relying on record evidence establishing that exclusivity arrangement

31

caused competing cable providers to not offer services to homeowners' association to hold that plaintiff established traceability).

Here, Maryland's Constitution, statutes, and court rules make clear that the Justices govern Maryland's courts, and that Maryland's administrative judges and clerks must comply with the rules the Justices adopt. To find traceability here, we need only recognize that individuals are impacted by the rules controlling their behavior. I find that requirement easily satisfied in this case.

Moreover, the district court granted summary judgment for Defendants before the parties even had the opportunity to pursue meaningful discovery. *See* J.A. 624. Plaintiffs cannot be faulted for their failure to provide evidence of traceability when they have barely had the opportunity to develop a record.

Finally, the majority claims that Plaintiffs cannot establish traceability because the Relief Act already exists and provides guidance to local employees. Maj. Op. 16. Such an argument misses the forest for the trees. There is no dispute that the Relief Act is already federal law. But it is not difficult to see how providing local guidance to local employees, rather than expecting them to keep abreast of every federal legal development, would have a "predictable effect" on their behavior, whether or not it technically changes the legal obligation to which they were already subject. *Dep't of Commerce*, 588 U.S. at 768.

## III.

At every stage, the Plaintiffs here suffered harm because Maryland's Justices failed to ensure compliance with the Relief Act. Consequently, the fetters Congress enacted to

32

prevent such harm in "any civil action or proceeding . . . in which the defendant does not make an appearance" made no difference. 50 U.S.C. § 3931(a). Congress placed the burden on courts to insulate servicemembers from harm, whether that harm is the result of pure negligence or malintent. The majority today limits Plaintiffs' ability to receive redress for their injuries. Congress intended far greater solicitude for members of our military and their families.

I respectfully dissent.